**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MANDY B.,[1] Plaintiff, v. FRANK A. BISIGNANO,[2] Defendant. | CIVIL NO. 1:24-CV-01382 (LATELLA, M.J.) |

**MEMORANDUM OPINION**

This is an action brought under Section 1383(c) of the Social Security Act and 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security (hereinafter, "the

---

[1] To protect the privacy interests of plaintiffs in social security cases, we have adopted the recommendation of the Judicial Conference of the United States that federal courts should refer to plaintiffs in such cases by their first name and last initial. *See Tammy H. v. Frank Bisignano*, Commissioner of Social Security, No. 1:24-cv-00838, Docket No. 19 at n.1 (M.D. Pa. Aug. 27, 2025).

[2] Frank Bisignano became the Commissioner of Social Security on May 7, 2025. He has been automatically substituted in place of the original defendant, Martin O'Malley. *See* Fed. R. Civ. P. 25(d); *see also* 42 U.S.C. § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security). The caption in this case is amended to reflect this change.

Commissioner") denying Plaintiff Mandy B.'s claims for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. (Doc. 1). Upon detailed consideration of the arguments raised by the parties in their respective briefs, the Commissioner's decision will be vacated and remanded.

## 1. BACKGROUND AND PROCEDURAL HISTORY

On September 4, 2020, Plaintiff Mandy B. ("Ms. B.") filed an application for Title II benefits. (Doc. 11-5 at 5)[3]. In this application, Ms. B. claimed disability beginning June 18, 2020. (*Id.*). The Social Security Administration initially denied Ms. B.'s claims on December 12, 2020, and again on reconsideration on June 4, 2021. (Doc. 11-3 at 19; Doc. 11-4 at 18). Ms. B. filed a request for a hearing before an Administrative Law Judge ("ALJ") on July 6, 2021. (Doc. 11-4 at 31, at X). ALJ Jarrod Tranguch conducted the requested hearing on November 4, 2021. (Doc. 11-2 at 37).

---

[3] For the sake of clarity, we refer in all instances to the ECF document numbers and pagination.

In a written opinion dated December 28, 2021, the ALJ determined that Ms. B. is not disabled and therefore not entitled to the benefits sought. (Doc. 11-2 at 32). Ms. B. appealed the ALJ's decision to the Appeals Council, who, on December 22, 2022, denied Ms. B.'s request for review. (Doc. 11-2 at 2). On February 1, 2023, Ms. B. filed an action in this Court, captioned *Burlingame v. Kijakazi*, No. 1:23-cv-00174 ("*Burlingame I*"). In that matter, United States Magistrate Judge Martin C. Carlson remanded the matter to the Commissioner for further proceedings. (*Burlingame I*, (Doc. 18 at 18)).

Pursuant to that remand order, the Appeals Council indicated that Ms. B. filed a subsequent claim for Title II benefits on December 30, 2022, and that the State agency found Ms. B. disabled as of March 21, 2022. (Doc. 11-8 at 5). The Appeals Council reviewed that determination and found that it was supported by substantial evidence. Accordingly, it directed ALJ Tranguch to offer Ms. B. an opportunity for a new hearing and issue a new decision for the period prior to March 21, 2022. (*Id.*).

On April 16, 2024, ALJ Tranguch conducted a second hearing. (Doc. 11-8 at 28). He issued an opinion on May 15, 2024, finding that

Ms. B. was not under a disability from June 18, 2020 through March 21, 2022. (Doc. 11-8 at 22).

Plaintiff filed a Complaint in the above-captioned action on August 16, 2024. (Doc. 1). The Commissioner responded on October 8, 2024, providing the requisite transcripts from the disability proceedings on April 16, 2024. (Docs. 10, 11). On August 28, 2024, the parties consented to proceed before a federal magistrate judge. (Doc. 9).[4] The parties then filed their respective briefs (Doc. 12; Doc. 14; Doc. 15), with Ms. B. alleging three errors warranting reversal or remand. (Doc. 12 at 15).

**2. THE ALJ'S DECISION**

In a decision dated May 15, 2024, the ALJ determined Ms. B. "has not been under a disability, as defined in the Social Security Act, from June 18, 2020 through March 21, 2022." (Doc. 11-8 at 22). The ALJ reached this conclusion after proceeding through the five-step

[4] On June 16, 2025, we provided notice to the parties of our intent to continue to exercise the jurisdiction previously consented to by the parties absent any express objection. (Doc. 16). No such objection was filed.

sequential analysis required by the Social Security Act. *See* 20 C.F.R. § 404.1520. The ALJ determined that Ms. B. met the insured status requirements of the Social Security Act through December 31, 2025. (Doc. 11-8 at 7).

At step one, an ALJ must determine whether the claimant is engaging in substantial gainful activity ("SGA"). 20 C.F.R § 404.1520(a)(4)(i). If a claimant is engaging in SGA, the Regulations deem them not disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520(b). SGA is defined as work activity—requiring significant physical or mental activity—resulting in pay or profit. 20 C.F.R. § 404.1572. In making this determination, the ALJ must consider only the earnings of the claimant. 20 C.F.R. § 404.1574. The ALJ determined Ms. B. "has not engaged in [SGA] since June 18, 2020, the alleged onset date." (Doc. 11-8 at 7). Thus, the ALJ's analysis proceeded to step two.

At step two, the ALJ must determine whether the claimant has a medically determinable impairment that is severe or a combination of impairments that are severe. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ determines that a claimant does not have an "impairment or

combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities, [the ALJ] will find that [the claimant] does not have a severe impairment and [is], therefore, not disabled." 20 C.F.R. § 404.1520(c). If a claimant establishes a severe impairment or combination of impairments, the analysis continues to the third step.

The ALJ found Ms. B. has the following severe impairments: intellectual disability, anxiety disorder, depressive disorder, conversion disorder, pseudogenic non-epileptic seizures, diabetes, neuropathy and obesity. (Doc. 11-8 at 8). The ALJ also identified Ms. B.'s non-severe impairments as: GERD (with Barrett's esophagus), chronic kidney disease, hypertension and a left wrist sprain. (*Id.*).

At step three, the ALJ must determine whether the severe impairment or combination of impairments meets or equals the medical equivalent of an impairment listed in 20 C.F.R. Part 404, Subpt. P, App. 1 (20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526). If the ALJ determines that the claimant's impairments meet these listings, then the claimant is considered disabled. 20 C.F.R. § 404.1520(a)(4)(iii). The ALJ determined that none of Ms. B.'s impairments, considered individually

or in combination, met or equaled a Listing. (Doc. 11-8 at 9). Specifically, the ALJ considered Listings 11.00 (Neurological Disorders), and 12.00 (Mental Disorders).

Between steps three and four, the ALJ determines the claimant's residual functional capacity ("RFC"), crafted upon consideration of the medical evidence provided. The ALJ determined that:

> Ms. B. has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant can stand and/or walk up to 15 minutes at a time and up to 2 hours total in an 8-hour workday. The claimant can occasionally perform pushing and/or pulling motions with the lower extremities, such as operating pedals and foot controls. The claimant can perform jobs that would not involve balancing, climbing on ladders, ropes or scaffolding or exposure to workplace hazards, such as unprotected heights and dangerous, moving machinery. The claimant could have occasional exposure to vibrations. The claimant can perform jobs, which would take no more than 30 days of training to learn with a specific vocational preparation level of two, which are generally classified as unskilled. The claimant can understand, remember and carry out simple instructions and can perform simple and routine tasks. The claimant can perform jobs that would be considered "low stress" in that they would involve only occasional, simple decision making, and only occasional, gradual changes in the work duties and work setting.

(Doc. 11-8 at 13).

Having assessed a claimant's RFC, at step four the ALJ must determine whether the claimant has the RFC to perform the requirements of their past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). A finding that the claimant can still perform past relevant work requires a determination that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). Past relevant work is defined as work the claimant has done within the past 5 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 404.1560(b). If the claimant cannot perform past relevant work or has no past relevant work, then the analysis proceeds to the fifth step.

The ALJ determined that Ms. B. is unable to perform past relevant work. (Doc. 11-8 at 20). The ALJ noted past relevant work as a nursing assistant, but the exertional requirements exceeded Ms. B.'s RFC. (*Id.*).

At step five of the sequential analysis process, an ALJ considers the claimant's age, education, and work experience to see if a claimant can make the adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v). These factors are not considered when evaluating a claimant's ability to

perform past relevant work. 20 C.F.R. § 404.1560(b)(3). If a claimant has the ability to make an adjustment to other work, they will not be considered disabled. 20 C.F.R. § 404.1520(a)(4)(v).

The ALJ made vocational determinations that Ms. B. was 42 years old on the alleged onset date, defined as a younger individual age 18-44 by the Regulations. 20 C.F.R. § 404.1563. (Doc. 11-8 at 20). The ALJ also noted that Ms. B. "has at least a high school education" as considered in 20 C.F.R. § 404.1564. (*Id.*). The ALJ determined that upon consideration of these factors, Ms. B.'s RFC, and the testimony of a vocational expert, "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Doc. 11-8 at 20). The ALJ specifically identified occupations of ampoule sealer, suture gauger, and pharmaceutical egg processor. (Doc. 11-8 at 21).

As a result of this analysis, the ALJ determined that Ms. B. was not disabled and denied her application for benefits. (Doc. 11-8 at 22).

### 3. STANDARD OF REVIEW

In order to receive benefits under Title II of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a). Additionally, to be eligible to receive benefits under Title II of the Social Security Act, a claimant must be insured for disability insurance benefits. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131.

In evaluating whether a claimant is disabled as defined in the Social Security Act, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a). Under this process, the Commissioner must determine, in sequence: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do past relevant work, considering his or her residual functional capacity ("RFC"); and (5) whether the claimant is able to do any other work that

exists in significant numbers in the national economy, considering his or her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a). The claimant bears the initial burden of demonstrating a medically determinable impairment that prevents him or her from doing past relevant work. 20 C.F.R. § 404.1512(a). Once the claimant has established at step four that he or she cannot do past relevant work, the burden then shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform that are consistent with his or her RFC, age, education, and past work experience. 20 C.F.R. § 404.1512(f).

In reviewing the Commissioner's final decision denying a claimant's application for benefits, the Court's review is limited to determining whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g) by reference); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotations omitted). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). In an adequately developed factual record, however, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). The question before the Court, therefore, is not whether Ms. B. is disabled, but whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-

CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence."); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The [Commissioner]'s determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012) ("[T]he court has plenary review of all legal issues decided by the Commissioner.").

## 4. Discussion

Ms. B. asserts that the ALJ committed three errors that warrant reversal or remand. First, she claims that he did not properly assess the medical opinions. Second, she claims that the ALJ's reliance upon her ADLs did not demonstrate that she can obtain and maintain full-time employment. Finally, she argues that the ALJ failed to include appropriate limitations for time off-task, attendance, and interacting with others. We will consider first consider Ms. B.'s claim regarding the ALJ's assessment of CRNP Nobels.

### A. THE ALJ ERRED IN HIS ASSESSMENT OF PLAINTIFF'S TREATING PROVIDER

Plaintiff argues that the ALJ failed to explain how he considered the consistency and supportability of the opinion of her treating provider, Shannon Nobels, CRNP. (Doc. 12 at 8-10). She alleges that the ALJ improperly discounted this opinion because it was supported by Plaintiff's subjective statements rather than objective clinical findings. (*Id*. at 8-9). Further, she claims that the ALJ erroneously reasoned that CRNP Nobels' opinion was inconsistent with the conservative level of mental health treatment. (*Id*. at 10). She claims that there is no evidence that medication therapy together with counseling is "conservative" treatment and that the ALJ has no knowledge of any other forms of treatment that were available or warranted for Plaintiff's impairments.

In response, the Commissioner argues that Plaintiff is improperly asking the Court to reweigh the evidence. (Doc. 14 at 14). The Commissioner claims that the ALJ adequately explained the basis for finding CRNP Nobels' opinion not persuasive. (*Id*. at 15-16).

In reply, Plaintiff argues that much of Commissioner's response is based upon the assertion that Plaintiff denied experiencing PNES after April 2021. (Doc. 15 at 1). Plaintiff claims this is legal error because the ALJ failed to consider a closed period of benefits based upon Plaintiff's functioning during the period when she was still experiencing PNES symptoms, on or before April 2021. (*Id.*). Similarly, Plaintiff argues that notwithstanding the "normal" mental examination findings cited by the ALJ and referenced by the Commissioner, the ALJ failed to account for the fact that she would "necessarily be off-task and unable to work during the period of time she [was] experiencing seizures . . . (at least for the period prior to April 2021)." (*Id*. at 3).

At the outset, we consider the standard for an ALJ's evaluation of medical opinions. Plaintiff filed her disability application on September 4, 2020, after the Social Security Regulations regarding consideration of medical opinion evidence were amended. Prior to March of 2017, the regulations established a hierarchy of medical opinions, deeming treating sources to be the gold standard. *See Alexandre v. Bisignano*, No. 1:24-CV-1785, 2025 WL 2045186, at *7 (M.D. Pa. July 21, 2025). However, in March of 2017, the regulations governing the treatment of

medical opinions were amended. *Id.* Under the amended regulations, ALJs are to consider several factors to determine the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion. *Id.* (citing 20 C.F.R. § 404.1520c(c)). The change to the consideration of medical opinion evidence has been summarized as follows:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for

> determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.
>
> An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id. at §§* 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(2), 416.920c(c)(2).
>
> Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). *Id.* at §§ 404.1520c(b)(3), 416.920c(b)(3).

*Fallin v. Bisignano*, No. 4:24-CV-180, 2025 WL 1749654, at *8–9 (M.D. Pa. June 24, 2025) (quoting *Andrew G. v. Comm'r of Soc.*

*Sec.*, No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020)).

When presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Mason*, 994 F.2d at 1066). Provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. *See Thackara v. Colvin*, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); *Turner v. Colvin*, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); *Connors v. Astrue*, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give

> partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. *See e.g., Thackara v. Colvin*, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

*Fernandez v. Bisignano*, No. 4:24-CV-412, 2025 WL 1427049, at *10 (M.D. Pa. May 15, 2025). "The presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009). "Thus, our inquiry is not whether evidence existed from which the ALJ could have drawn a contrary conclusion, but rather whether substantial evidence existed in the record to support the ALJ's decision to credit or discredit each medical opinion, and whether the ALJ appropriately articulated his decision under the regulations." *Hajdarevic v. Dudek*, No. 3:24-CV-00636, 2025 WL 1004377, at *17 (M.D. Pa. Apr. 3, 2025). Ultimately, to reverse the ALJ's findings and decision, "we must find that the evidence not only *supports* [a contrary] conclusion, but *compels* it." *Bazewicz v. Kijakazi*, No. 3:21-CV-00504, 2022 WL 4357480, at *3 (M.D. Pa. Sept. 20, 2022) (quoting *Immigration & Naturalization Serv. v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992)).

Against that backdrop, we consider the ALJ's evaluation of CRNP Nobels' opinion. CRNP Nobels completed a Mental Impairment Questionnaire on March 31, 2021. (Doc. 11-7 at 24-29). She opined that Plaintiff is "seriously limited" in her ability to remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, maintain attention for two-hour segments, sustain an ordinary routine without special supervision, make simple, work-related decisions, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and to be aware of normal hazards and take appropriate precautions.[5] (Doc. 11-7 at 26-27). CRNP Nobels also opined that Plaintiff would be unable to meet competitive standards with respect to maintaining regular attendance

---

[5] CRNP Nobels also opined on certain mental abilities needed to do semiskilled and skilled work. (Doc. 11-7 at 27). However, the ALJ determined that Plaintiff is limited to unskilled work, and so, we need not consider those opinions. (*See* Doc. 11-8 at 13).

and being punctual, working in coordination with or proximity to others without being unduly distracted, and completing a normal workday and workweek without interruptions from psychologically based symptoms. (*Id*.). She opined that Plaintiff had marked limitations in interacting with others, concentrating, persisting, maintaining pace, and adapting in the workplace as well as moderate limitations in remembering information, and managing oneself in the workplace. (*Id*. at 28). CRNP Nobels also opined that Plaintiff would be absent more than four days per month. (*Id*. at 29).

The ALJ found that CRNP Nobels' opinion was not persuasive. (Doc. 11-8 at 18). In explaining this decision, the ALJ stated that:

> The opinion is not supported and explained by objective clinical findings but rather focuses on the reported symptoms of the claimant. The opinion is also not consistent with the evidence in the record, including the records of Nurse Nobles. For instance, an examination from March 17, 2021 by Nurse Nobles, showed that despite an anxious/dysphoric mood with a constricted affect, the claimant had normal speech, coherent thought process, intact associations, alert and oriented to person, place, and time, attentive, cooperative attitude and intact insight and judgment (Exhibit B6F/64). Further, this level of limitation is inconsistent with the conservative level of mental health treatment with medication and outpatient therapy, as opposed to inpatient or partial treatment or a need for emergency interventions, which are not found in the record.

(Doc. 11-8 at 18).

We will consider each of Plaintiff's arguments relating to the ALJ's consideration of CRNP Nobels' opinion.

**1. The ALJ Improperly Discounted Mental Health Findings Based Upon Subjective Complaints**

Plaintiff first argues that the ALJ improperly rejected CRNP Nobels' mental health findings because they were based largely upon subjective reports rather than objective clinical findings. (Doc. 12 at 8).

Courts have recognized that in the case of mental health impairments, a medical source's opinion which relies on subjective complaints should not necessarily be undermined because psychological and psychiatric conditions by nature are largely diagnosed on the basis of a patient's subjective complaints. *Lex v. Berryhill*, No. 3:17-CV-2204, 2018 WL 4212413, at *8 (M.D. Pa. Sept. 4, 2018) (citing *Schickel v. Colvin*, No. 14 C 5763, 2015 WL 8481964, at *11 (N.D. Ill. Dec. 10, 2015); *Hall v. Astrue*, 882 F. Supp. 2d 732, 740 (D. Del. 2012)); *see also Bazewicz*, 2022 WL 4357480, at *5. The court, in *Frye v. Berryhill*, Civ. A. No. 3:16-CV-1482, 2017 WL 4387060 (M.D. Pa. Oct. 3, 2017),

explained the difficulties in ascertaining the severity of mental health impairments as follows:

> Mental impairments such as depression and anxiety ... may manifest in symptoms difficult to quantify through objective medical evidence. A lack of objective medical evidence is by itself insufficient to discredit [a] claimant. . . . As noted by other courts in the Third Circuit, impairments such as depression and anxiety "while medically determinable, are difficult to substantiate by objective medical evidence." *Volage v. As true*, No. 11-CV-4413, 2012 WL 4742373, at *7 (D.N.J. Oct. 1, 2012). "[T]he reports of treating physicians, as well as testimony by the claimant, become even more important in the calculus for making a disability determination" in circumstances involving impairments for which objective medical testing may not demonstrate the existence or severity of an impairment. *See Perl v. Barnhart*, No. 03-4580, 2005 WL 579879, at *3 (E.D. Pa. March 10, 2005) (citing *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2002)).

*Frye*, 2017 WL 4387060, at *4.

Here, in explaining why he found CRNP Nobles' opinion not persuasive, the ALJ stated that "[t]he opinion is not supported and explained by objective clinical findings but rather focuses on the reported symptoms of the claimant." (Doc. 11-8 at 18).

On the Mental Impairment Questionnaire, CRNP Nobels indicated that Plaintiff's "DSM-5 Mental Disorders/Principal Diagnoses" include conversion disorder with attacks or seizures,

generalized anxiety disorder, and major depressive disorder. (Doc. 11-7 at 24). Conversion disorder, now referred to as functional neurologic disorder, is a psychiatric disorder characterized by signs and symptoms affecting sensory or motor function inconsistent with patterns of known neurologic diseases or other medical conditions and significantly impacting a patient's ability to function. *See* Jessica L. Peeling and Maria Rosario Muzio, *Functional Neurologic Disorder*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK551567/ (last visited Aug. 5, 2026); *see also Conversion disorder (functional neurological symptom disorder)*, Harvard Health Publishing, https://www.health.harvard.edu/a_to_z/conversion-disorder-functional-neurological-symptom-disorder-a-to-z (last visited Aug. 5, 2026). The symptoms cannot be controlled at will and are not considered to be intentionally feigned by the patient. *Id*. Plaintiff was diagnosed with psychogenic nonepileptic seizures ("PNES") in conjunction with conversion disorder. (Doc. 11-7 at 119, 540). This is the most common subtype of conversion disorder. Peeling, *supra*; *see also Conversion disorder (functional neurological symptom disorder, supra*. Patients experiencing seizure-like activity in a PNES episode will not have

paroxysmal activity on an electroencephalogram. *Id.* In fact, "[t]here are no standard tests for functional neurologic disorder." *Functional neurologic disorder/conversion disorder*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/conversion-disorder/diagnosis-treatment/drc-20355202 (last visited Aug. 5, 2026). Diagnosis usually involves an assessment of existing symptoms and ruling out any neurological or other medical condition that could cause the symptoms and evaluation for conversion disorder entails providers asking in-depth questions about the patient's health, symptoms, thoughts, feelings, and behavior. *Id.*

Therefore, at least with respect to Plaintiff's conversion disorder, it is unclear what types of objective evidence CRNP Nobles could have documented to substantiate her opinions as there do not appear to be objective clinical findings that would confirm a diagnosis or assessment of conversion disorder. Rather, the indication for diagnosing such condition necessarily comes from subjective reports. And CRNP Nobels' records indicate that Ms. B. reported PNES episodes, at least through April 2021. (*See* Doc. 11-7 at 532) (On Oct. 5, 2020, Ms. B. reported to CRNP Nobels that she had "several more PNES since last seen"); (*id.* at

540) (on Oct. 26, 2020, Ms. B. and her mother reported that she had two episodes of PNES since last seen); (*id*. at 548) (on Nov. 18, 2020 Ms. B. reported PNES episodes were shorter in duration); (*id*. at 556) (on Dec. 15, 2020 Ms. B. "endorse[d] PNES when having to leave home"); (*id*. at 573) (on Feb. 17, 2021, CRNP Nobels documents that "she has experienced several episodes of PNES since last seen"); (*id*. at 581) (on Mar. 17, 2021, CRNP Nobels states that Ms. B. "endorses symptoms of social anxiety, which potentially triggers episodes of PNES"); (*id*. at 670) (on July 26, 2021, CRNP Nobels states that Ms. B. denies PNES since last seen in April).

We therefore find that the ALJ erred in discounting this opinion due to the fact that it "focuses on the reported symptoms of the claimant" rather than on objective clinical findings. (*See* Doc. 11-8 at 18).

**2. The ALJ Erred in the Supportability and Consistency Analyses of CRNP Nobels' Opinion**

Plaintiff also argues that the ALJ erred in his reasoning regarding the consistency and supportability of CRNP Nobels' Opinion. (Doc. 12 at 10).

As noted above, under the regulations, in evaluating the persuasiveness of medical opinions, ALJs must explain how they "considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

Supportability and consistency are defined in 20 C.F.R. §§ 404.1520c(c), 416.920c(c). *Pelliccia v. Dudek*, No. 1:24-cv-00428, 2025 WL 624262, at *8 (M.D. Pa. Feb. 26, 2025). As the regulations provide, supportability means: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* (citing 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1)). "Simply put, supportability is an inquiry geared toward assessing how well a medical source supported and explained their opinion(s)." *Id.* (citing *Acosta Cuevas v. Commissioner of Social Security*, No. 20-CV-0502, 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021), *adopting report and recommendation*, 2022 WL 717612, at *1 (S.D.N.Y. Mar. 10, 2022)). On the other hand,

consistency means: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from *other* medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. (citing 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) (emphasis added).

As discussed *supra*, we find the ALJ erred in his assessment of the supportability of CRNP Nobels' opinion based upon the lack of objective clinical findings.[6] The ALJ's discussion of consistency with respect to CRNP Nobels' opinion is similarly deficient.

The ALJ found that the opinion was "not consistent with the evidence in the record, including the records of Nurse Nobles." (Doc. 11-8 at 18). The ALJ went on to say, "[f]or instance, an examination from March 17, 2021 by Nurse Nobles, showed that despite an anxious/dysphoric mood with a constricted affect, the claimant had normal speech, coherent thought process, intact associations, alert and

[6] As noted *supra*, there appears to be substantial evidence in CRNP Nobels' records supporting her opinions.

oriented to person, place, and time, attentive, cooperative attitude and intact insight and judgment (Exhibit B6F/64)."

The ALJ does not identify any specific evidence in the record that CRNP Nobels' opinion is inconsistent with other than one of CRNP Nobels' own records. (Doc. 11-8 at 18). But that record would go to the *supportability* not the *consistency* of the opinion.[7] Our review of the record tends to show that CRNP Nobels' opinions are consistent with documentation of other providers. (*See* Doc. 11-7 at 97) (describing episode where Plaintiff was unresponsive for 5 minutes and "ER felt it was conversion disorder due to pseudoseizures"); (Doc. 11-7 at 116-119) (July 5, 2020 ED note indicating patient presentation is most consistent

---

[7] In any event, we are not necessarily persuaded that CRNP Nobels' March 17, 2021 note can be construed as inconsistent with her opinion. While, as the ALJ notes, the March 17, 2021 note does indicate that Ms. B. had normal speech, coherent thought process, intact associations, and was alert and oriented to person, place and time, attentive cooperative, and had intact insight and judgment, the note also documented her mood as anxious and dysphoric with a constricted affect. (Doc. 11-7 at 582). It further noted that Ms. B. endorsed moderate symptoms of anxiety and depression "most days" and social anxiety, "which potentially triggers episodes of PNES." (*Id.* at 581).

with conversion disorder); (Doc. 11-7 at 38) (July 7, 2020 note of Sarah Eccker, PAC, documenting diagnosis of conversion disorder).

Accordingly, we find that the ALJ erred in conflating the required analyses for supportability and consistency and in failing to specify any evidence in the record, other than one CRNP Nobels' own records, that is inconsistent with her opinion.

### 3. Classification of Mental Health Treatment as Conservative

Finally, Ms. B. argues that the ALJ erred in determining that CRNP Nobels' opinion is not persuasive based upon a finding that her treatment was conservative and did not require inpatient treatment or emergency intervention. (Doc. 12 at 10).

Courts in this District have explained that "reliance on 'conservative treatment' to discount an opinion or credibility takes on special significance in the mental health context." *Hull v. Berryhill*, No. 18-cv-0006, 2018 WL 3546555, at *10 (M.D. Pa. July 24, 2018). No bright-line rule exists "for what constitutes 'conservative' versus 'radical' treatment." *Robert M. Kijakazi*, 22-cv-1476, 2023 WL 5839299,

at *9 (M.D. Pa. Aug. 7, 2023), *approved and adopted*, No. 4:22-cv-1476, 2923 WL 5628604 (M.D. Pa. Aug. 31, 2023). As one court explained,

> It may be appropriate for a doctor or other qualified expert to form an opinion that one would expect to see a more aggressive treatment history for a medical issue. Such an opinion would be based upon the doctor's years of medical training and clinical experience, and it would enable him to form a general guideline about the relationship of aggressive treatment history and severity of the particular disorder. Such an opinion is often offered by an examining or consulting physician and can form the basis of an ALJ's determination that the level of treatment is not commensurate with the limitations identified by the treating physician. But the ALJ is not free to 'go it alone.'

*Cordero v. Kijakazi*, 597 F. Supp. 3d 776, 799 (E.D. Pa. 2022).

In the context of mental health impairments, lack of evidence of inpatient hospitalizations or emergency room visits does not render treatment conservative where the record shows a claimant took medication to control her mental health conditions for years and consistently sought treatment from mental health professionals during the relevant time period. *Hull*, 2018 WL 3546555, at *10 (citing *Thomas v. Colvin*, Civ. A. No. 15-876, 2016 WL 4537065, at *3 (W.D. Pa. Aug. 30, 2016)); *see also Cordero*, 597 F. Supp. 3d at 779 (ALJ's finding that plaintiff's mental limitations were inconsistent with her

routine and conservative treatment not supported by substantial evidence where record showed years of taking psychotropic medications and therapy); *Thomas*, 2016 WL 4537065, at *3 (W.D. Pa. Aug. 30, 2016) (ALJ erred when he negatively assessed Plaintiff's mental health treatment as “limited” and “conservative” when she took Depakote and Xanax for years, attended counseling sessions with psychologist weekly, and saw psychiatrist every one to three months).

Here, as a final basis for finding CRNP Nobels’ opinion not persuasive, the ALJ stated that the level of limitations assessed was inconsistent with the “conservative level of mental health treatment with medication and outpatient therapy, as opposed to inpatient or partial treatment or a need for emergency interventions, which are not found in the record.” (Doc. 11-8 at 18).

Ms. B. was prescribed Celexa (Doc. 11-7 at 35), Rexulti (Doc. 11-7 at 535) and Trazodone (*id.*). She participated in weekly outpatient therapy (*see* Doc. 11-7 at 522) and saw a CRNP monthly for psychiatric evaluations and medication management (*see id.* at 528-30). We are unable to find support in the record for the ALJ’s finding that this treatment was conservative in the form of an opinion by a medical

professional; rather, it appears to be based upon the ALJ's lay judgment. As other courts have explained, the ALJ erred in making such a conclusion in light of this record.

Because we find that the ALJ erred with respect to each basis for his determination that CRNP Nobels' opinion was not persuasive, we are constrained to find that this determination is not supported by substantial evidence.

### B. <u>We Cannot Say the ALJ's Error was Harmless</u>

Having determined that the ALJ erred in consideration of CRNP Nobels' opinion, we must now consider whether that error was harmless. *See Minarsky v. Kijakazi*, 747 F. Supp. 3d 801, 816 (M.D. Pa. 2024). Social Security appeals are subject to harmless error analysis. *See Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016). Under the harmless error analysis, remand is warranted only if there is "reason to believe that the remand might lead to a different result." *Timothy J. B. v. O'Malley*, No. 4:22-cv-1036, 2024 WL 968875, at *4 (M.D. Pa. Mar. 6, 2024) (quoting *Moua v. Colvin*, 541 F. App'x 794, 798 (10th Cir. 2013) (citation and internal quotation marks omitted)).

Here, remand may lead to a different outcome. If the ALJ finds the opinion of CRNP Nobels persuasive on remand and incorporates the limitations assessed by CRNP Nobels, he may find that she is unable to work. These limitations suggest that Plaintiff cannot meet the competitive standard in various areas of functioning, including staying on task and maintaining attendance.

We note, however, that CRNP Nobels issued her opinion on March 31, 2021. (*See* Doc. 11-7 at 29). As Plaintiff seemingly concedes in her Reply, the evidence suggests that her PNES episodes stopped in April 2021. (*See* Doc. 15 at 1). Nevertheless, Plaintiff claims that the ALJ should have considered whether Ms. B. was entitled to benefits for a closed period of time within the relevant period of time from June 18, 2020 through March 21, 2022. (*Id*. at 1-2). We cannot say whether Plaintiff can establish an entitlement to benefits for a closed period of time through April 2021 because, as Plaintiff acknowledges, Plaintiff must establish "a continuous period of disability of not less than 12 months." (*Id*. at 2) (quoting *Robertson v. Berryhill*, No. 6:16-CV-06481 (MAT), 2017 WL 3574626, at *2 (W.D.N.Y. June 2, 2016)). The alleged onset date here is June 18, 2020, and so, a period from June 2020

through April 2021 does not satisfy the required continuous 12-month period. (*See* Doc. 11-5 at 5). Plaintiff, however, suggests that SSR 23-1P permits an ALJ to measure the 12-month period from a date *prior* to the period during which he or she is considering eligibility. (Doc. 15 at 2) (citing Social Security Ruling, SSR 23-1p; Titles II and XVI: Duration Requirement for Disability, 88 FR 76885-01, at *76886 (Nov. 7, 2023)).

Therefore, we will remand this matter for the ALJ to re-consider CRNP Nobels' opinion and evaluate whether Ms. B. was under a disability for any period of time between June 18, 2020 and March 21, 2022.[8]

---

[8] The Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the case for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100-01 (1991). However, the Third Circuit has advised that benefits should only be awarded where "the administrative record of the case has been fully developed and when substantial evidence in the record as a whole indicates that the claimant is disabled and entitled to benefits." *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000). *See generally Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

### C. Plaintiff's Remaining Arguments

Because the Court concludes that the ALJ's assessment of CRNP Nobels' opinion is not supported by substantial evidence, and will vacate and remand the decision of the Commissioner for further consideration, the Court declines to address Ms. B.'s remaining arguments. "A remand may produce different results on these claims, making discussion of them moot." *Burns v. Colvin*, 156 F. Supp. 3d 579, 598 (M.D. Pa. 2016). The Court's evaluation of Ms. B.'s additional contentions would be futile given that the ALJ's decision concerning Ms. B.'s RFC assessment may yield a different result.

## 5. Conclusion

Based on the foregoing and pursuant to 42 U.S.C. § 405(g), the Commissioner's decision will be **vacated** and the case will be **remanded** to the Commissioner to fully develop the record, conduct a new administrative hearing, and appropriately evaluate the evidence pursuant to sentence four of 42 U.S.C. § 405(g).

An appropriate order follows.

Dated: August 7, 2026

**/s/ Leo A. Latella**
Leo A. Latella
United States Magistrate Judge